UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

THE NEW YORK TIMES COMPANY and
RON NIXON,

                Plaintiffs,

      -against-

UNITED STATES DEPARTMENT
OF THE TREASURY,

                Defendant.

----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/13/10

**DECISION AND ORDER**

09 Civ. 10437 (FM)

**FRANK MAAS,** United States Magistrate Judge.

      In this action brought pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, plaintiffs The New York Times Company and Ron Nixon (together, the "Times") seek the identities of individuals who have been granted a license by the Office of Foreign Assets Control ("OFAC") to conduct activities in or with foreign countries that would otherwise be unlawful under United States economic sanctions programs. The Times seeks summary judgment on the ground that defendant United States Department of the Treasury ("Treasury"), of which OFAC is a part, has improperly withheld the names of these individuals. (ECF No. 9). Treasury has cross-moved for summary judgment, contending that the withholding of the names was appropriate under 5 U.S.C. § 552(b)(6), the FOIA exemption for personal information ("Exemption 6"). (ECF No. 17). For the reasons that follow, the Times' motion for summary judgment is granted, and Treasury's motion is denied.

I.  Background

The relevant facts are undisputed. (See ECF No. 22 ("Times Reply Mem.") at 1 n.1 (accepting Treasury's account of the only three disputed facts)). Those facts may be summarized as follows:

A.  OFAC Licenses

OFAC is the unit within Treasury principally responsible for administering United States economic sanctions programs. (Decl. of Marshall H. Fields, Jr., dated Apr. 26, 2010 (ECF No. 18) ("Fields Decl."), ¶ 3). These economic sanctions programs, directed at foreign states or regimes and individuals within foreign states, aim to further United States foreign policy or national security. (Id.). Pursuant to the programs, OFAC acts to "impose controls on transactions and to freeze, or 'block,' certain property in which any foreign country or foreign national has any interest that is within the United States or in the possession or control of U.S. persons." (Id.). OFAC currently administers more than twenty sanctions programs, including those directed at Iran, Burma, Cuba, and Sudan, as well as "list-based" programs directed at specific regimes or individuals, such as those in Syria and Iraq and the former regime of Charles Taylor in Liberia. (Id. ¶ 4).

OFAC has the discretion to issue licenses allowing individuals, corporations, and other organizations to engage in activities, transactions, or travel that would otherwise be prohibited by the sanctions programs. These licenses permit far-ranging activities, including visits to immediate family in sanctioned countries, research

and education, humanitarian activities, and a variety of corporate transactions.  (See Decl. of David E. McCraw, dated Mar. 1, 2010 (ECF No. 11) ("McCraw Decl."), Ex. B (Licensing Categories & Sub-Categories)).  OFAC issues some licenses pursuant to specific licensing policies set forth in the Code of Federal Regulations; others are issued on a case-by-case basis for transactions not addressed in the regulations.  (Fields Decl. ¶ 10).

  B. FOIA Request

On December 19, 2007, Ron Nixon, a reporter assigned to the Business and Financial News Bureau of the Times submitted a FOIA request to Treasury.  (See McCraw Decl. ¶ 2 & Ex. A).  The request sought "access to and copies of [the OFAC] database of individuals and companies with OFAC licenses."  (Id. Ex. A).  While the request was pending, the Times "notified OFAC that it would limit [its r]equest by excluding information pertaining to [certain] categories of OFAC licenses," including those related to family visits, sports, education, religious activities, journalistic activity, and official government business.  (Id. ¶ 4; Fields Decl. ¶ 6).

In September 2008, the Times initiated a FOIA action in this Court to "compel Treasury to release the spreadsheets of licensees."  (McCraw Decl. ¶ 7; see also The New York Times Co. v. U.S. Dep't of Treasury, No. 08 Civ. 8341 (PGG) (filed Sept. 29, 2008) ("Prior Action")).  In March 2009, Treasury produced to the Times a redacted version of a computer printout listing both corporate and individual OFAC licensees.  (McCraw Decl. ¶ 8).  In the computer printout, Treasury identified the corporate

licensees, but redacted the names of more than 9,000 individual licensees.  (See id.; Fields Decl. ¶¶ 7-8; Decl. of Jacob P. Goldstein, dated May 10, 2010 (ECF No. 23), ¶¶ 4-5 & Ex. A).

On June 22, 2009, the Times and Treasury entered into a stipulation to dismiss the Prior Action.  (McCraw Decl. Ex. D).  Pursuant to that stipulation, the Times reserved the right to challenge, through the FOIA administrative process, the denial of information about five fields from the OFAC license database, which concerned the individual licensees.[1]  (Id.; see also Fields Decl. at 4 n.1).  In July 2009, the Times brought that administrative appeal, which was denied on September 18, 2009.  (McCraw Decl. ¶¶ 12-13 & Exs. E, F).

C. Procedural History

On December 23, 2009, the Times filed this lawsuit.  (ECF No. 1).  On March 3, 2010, the Times filed its motion for summary judgment, arguing that, as a matter of law, Treasury improperly withheld the names of individual licensees.  (ECF No. 9).  On April 26, 2010, Treasury filed a cross-motion for summary judgment, in which it asserts that the names of individual licensees were properly redacted pursuant to Exemption 6 of FOIA.  (ECF No. 17).  That same day, the parties consented to my exercise of jurisdiction over this case for all purposes pursuant to 28 U.S.C. § 636(c).  (ECF No. 16).

---

[1] Those fields are the LICENSEE, CASE_LICENSEE, CASE_LICENSEE_NAME, OTHER_LICENSEES, and REC_LICENSEE_NAME fields.  (McCraw Decl. Ex. D).

II.  FOIA

Through its enactment of FOIA, Congress endorsed "a general philosophy of full agency disclosure." Dep't of Air Force v. Rose, 425 U.S. 352, 360 (1976) (quoting S. Rep. No. 89-813, at 3 (1965)).  "[FOIA] seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." EPA v. Mink, 410 U.S. 73, 80 (1973).  Under the statute, agencies must disclose their records upon request unless they can show that the requested records fit within at least one of nine enumerated exemptions.  See 5 U.S.C. § 552(b) (listing exemptions); Mink, 410 U.S. at 79.  The exemptions are "explicitly made exclusive." Mink, 410 U.S. at 79.  Citizens may file a challenge to an agency's response to a FOIA request in a district court, which "shall determine the matter de novo [with] the burden . . . on the agency to sustain its action."  5 U.S.C. § 552(a)(4).

Summary judgment is the preferred vehicle for resolving FOIA cases.  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994).  The agency can meet the latter requirement through affidavits and declarations "giving reasonably detailed explanations why any withheld documents fall within an exemption." Id.  Typically the agency will submit descriptions of the withheld or redacted documents, along with affidavits or declarations from relevant individuals.  If

the agency's submissions are adequate on their face, the district court may "forgo discovery and award summary judgment," unless the plaintiff makes a showing of bad faith sufficient to impugn the agency's declarations, provides "tangible evidence that an exemption claimed should not apply," or shows that summary judgment is otherwise inappropriate.  Id. (quoting Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978)).

In resolving a motion for summary judgment in a FOIA case, the Court must construe the statute broadly in favor of public disclosure and must construe the exemptions narrowly.  See U.S. Dep't of Justice v. Julian, 486 U.S. 1, 8 (1988); Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999).  Similarly, in keeping with FOIA's goal of full disclosure, all doubts must be resolved in favor of disclosure.  See Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 69 (2d Cir. 2009); Grand Cent., 166 F.3d at 478.

III.   Discussion

   A.   Exemption 6

Exemption 6 protects "personnel and medical files and similar files" when their disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The exemption thus is intended to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  U.S. Dep't of State v. The Washington Post Co., 456 U.S. 595, 599 (1982).

To determine whether information is protected by Exemption 6, the Court first must determine whether it is contained in "personnel and medical files and similar

files."  See Associated Press v. U.S. Dep't of Defense, 554 F.3d 274, 291 (2d Cir. 2009).  The Supreme Court has read the "similar files" provision broadly, finding that "[t]he exemption [was] intended to cover detailed Government records on an individual which can be identified as applying to that individual."  Washington Post Co., 456 U.S. at 602 (quoting H.R. Rep. No. 89-1497, at 11 (1966)) (alteration in original).

If the Court finds that the information is kept in the type of file covered by Exemption 6, it then must "balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy."  Associated Press, 554 F.3d at 291.  To do so, the Court must determine first whether there is more than a de minimis privacy interest in the information.  See Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs, 958 F.2d 503, 510 (2d Cir. 1992) (only a "measurable" privacy interest is required to trigger application of balancing test).  Only if there is such a privacy interest does the Court consider the public interest that disclosure would serve.[2]  Associated Press, 554 F.3d at 291.

The Times does not dispute that the information regarding individual licensees is contained in "similar files" within the meaning of Exception 6, nor could it, as numerous courts have determined that a list of names is a "similar file" for Exemption

---

[2] Unlike all other FOIA exemptions (as to which such considerations are prohibited), Exemption 6 requires the Court to consider the proposed use of the information by the requester.  See Fed. Labor Relations Auth., 958 F.2d at 509 ("Only where a privacy interest is implicated does the public interest for which the information will serve become relevant and require a balancing of the competing interests.").

6 purposes.  See, e.g., Wood v. FBI, 432 F.3d 78, 87 (2d Cir. 2005); Lardner v. Dep't of Justice, 638 F. Supp. 2d 14, 24 (D.D.C. 2009).  Accordingly, the Court turns to the balancing of the individual licensees' privacy interest in their identities against the public's interest in disclosure.

  B.  Privacy Interest

    The privacy interest in a list of names is not inherently substantial.  Instead, "whether disclosure of a list of names is a significant or a de minimis threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue."  U.S. Dep't of State v. Ray, 502 U.S. 164, 177 n.12 (1991) (internal quotation marks omitted & emphasis added); see also Wood, 432 F.3d at 88 (citing Ray).

    Treasury argues that "the names of the individual OFAC licensees are exactly the kind of highly personal information that implicates a substantial privacy interest under FOIA."  (ECF No. 21 ("Treasury Mem.") at 12).  The agency further contends that the disclosure of names on this list will expose the individuals to possible embarrassment, scorn, and harassment.  (Id. at 13-15).  In particular, Treasury maintains that disclosure "would associate [the licensees] with sanctioned nations or entities and could result in unwarranted contact or harassment from members of the public or the media, or a stigmatizing effect on their personal or professional character."  (Id. at 14).

    The Times counters that a privacy interest is not established where stigmatization is unlikely.  (Times Reply Mem. at 5, 8).  It further maintains that the risk

of any negative consequences here resulting from disclosure is minimized because there are several thousand similarly-situated individuals. (Id. at 6). Finally, the Times seeks to distinguish these licensees from other individuals whose identities have been shielded from disclosure under Exception 6 on the ground that the licensees affirmatively sought to interact with the federal government by seeking – and in fact receiving – a special government benefit. (ECF No. 10 ("Times Mem.") at 10-11).

It certainly is conceivable that disclosure of the individual licensees' identities could result in unwanted contact or harassment for some of the licensees. Indeed, many of the sanctioned countries and entities are considered controversial within the United States, and it thus is possible that the licensees' mere association with such countries or entities would generate negative responses from certain elements of American society. The licensees' privacy interest is therefore more than de minimis.

The difficulty here, however, is that this alleged harm is entirely speculative. Treasury simply has not shown that the licensees face an imminent, or even a known, risk of harassment, nor has it shown that their physical safety is at issue. Indeed, the most likely "harm" identified by Treasury is that members of the public or the media will utilize other sources to determine how to contact the licensees and then will do so. (See Fields Decl. ¶ 9). The mere fact that someone might seek to interview a licensee does not mean, however, that the individual would be subject to opprobrium or harassment.

Treasury's arguments about the dangers of disclosure are further weakened by the lack of evidence that any of the corporate licensees – whose identities were released to the Times – have faced any negative consequences following that disclosure.[3] Admittedly, the reaction of the public or media to individual licensees might differ from the reaction to corporate licensees, and the corporate licensees might have the resources to deal more effectively with any harassment or stigmatization.  Nonetheless, the fact that Treasury has not adduced any evidence that any corporate licensee suffered negative consequences from the disclosure of its association with a sanctioned country or entity casts additional doubt on Treasury's suggestion that individuals would face such negative consequences.

Indeed, the only "evidence" that Treasury has proffered concerning the threat of stigmatization is a declaration from the official who oversees the processing of FOIA requests in OFAC who states that stigmatization "could" result.  (Fields Decl. ¶¶ 2, 9).  Treasury has failed to offer any evidence – anecdotal or otherwise – that supports this conclusory assertion.

In contrast to the speculative harm that forms the basis for its reliance on Exception 6 here, in cases in which courts have found a significant privacy interest, the government has identified far more definite harms.  For example, in Washington Post, the plaintiff newspaper filed a FOIA request during the Carter administration seeking

---

[3] I utilize the parties' term of "corporate licensees," but note that the database entries regarding these entities apparently include all licensees that are not individuals.  (See Fields Decl. ¶ 7) (referring to "companies or other entities").

documents indicating whether two high-placed officials in Iran's Revolutionary Government were United States passport holders, a request it said could be satisfied by indicating whether the individuals were United States citizens. 456 U.S. at 596. At the time, both men were Iranian nationals living in Iran. Id. In response to the request, the State Department provided the affidavit of an Assistant Secretary of State who alleged that any confirmation that the Iranians held United States passports "would cause a real threat of physical harm" to them.[4] Id. at 597.

Similarly, in Ray, Haitian citizens who attempted to emigrate to the United States, but who had been intercepted and returned to Haiti, were interviewed as part of the State Department's effort to monitor Haiti's compliance with its assurance that it would not harass or prosecute such individuals upon their return to Haiti. 502 U.S. 167-68. The plaintiffs sought access to the names of those interviewed. Id. at 175. The Supreme Court held that while the danger was not quantifiable, the interview program existed solely because of the risk that these individuals would be harassed upon their return, and, thus, there clearly was some risk of such harm. Id. at 176-77.

Here, by comparison, the best Treasury can do is opine that disclosure "could" result in scorn, harassment, stigmatization, as well as efforts to contact the licensees. (Fields Decl. ¶ 9). However, to the extent that disclosure does expose the

---

[4] In his affidavit, the Assistant Secretary also opined that: "An official of the Government of Iran who is reputed to be an American citizen would, in my opinion, be in physical danger from some of the revolutionary groups that are prone to violence." Id. at 597 n.2.

11

licensees to some possibility of harassment, the disclosed association is one that the licensees affirmatively and voluntarily chose.  This differs from situations in which an individual has not affirmatively interacted with the government.  Thus, in Associated Press, revelation of the names of family members of Guantanamo detainees would have disclosed an affiliation that those individuals had not sought.  554 F.3d at 292.  Similarly, in Wood, the government employees assigned to an internal investigation presumably had not asked to be assigned to that investigation.  432 F.3d at 82.

   This is not to say that individuals who seek government benefits lose all expectation of privacy.  Rather, it simply suggests that when focusing on the consequences of disclosure of an individual's association with a particular list, the degree to which such an association is voluntary is relevant.  Here, the individual licensees applied for – and received – a special government benefit pursuant to which they were exempted from generally applicable laws.

   Moreover, the fact that there are more than 9,000 similarly-situated individuals reduces the risk of harm resulting from disclosure of the licensees' identities.  See Washington Post Co. v. U.S. Dep't of Agric., 943 F. Supp. 31, 34 (D.D.C. 1996) ("Indeed, it is precisely because the list is so large and the information so generic that the individual privacy interests are so small.").  Accordingly, no individual licensee will be singled out by appearing on this list.

   In sum, although the privacy interest in this case is more than de minimis, it is fairly minimal as it is based solely on the speculative argument that individuals who

voluntarily applied for a government benefit will be harassed because they received such a benefit.

C. Public Interest

Because the privacy interest is more than de minimis – albeit minimal – the Court must balance the individual licensees' privacy interest against the public interest to be served by disclosure. The only recognizable type of public interest is that served by FOIA itself – providing transparency and accountability for agency action. See Associated Press, 554 F.3d at 285 ("[T]he Supreme Court has made clear that there is only one relevant interest, namely, 'to open agency action to the light of public scrutiny.'") (quoting U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 772 (1989)).

"Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose." Ray, 502 U.S. at 177-78. Here, the names of the licensees are the direct product of agency decisionmaking. Indeed, disclosure of the licensees' names is the only way for the public to account for OFAC's actions. As many applications for OFAC licenses are considered on a case-by-case basis, there seemingly is no metric that would allow the public to oversee OFAC's actions in this area other than to see the product of that decisionmaking, i.e., the names of the approved licensees.

Treasury argues that the names of the licensees in fact provides no information other than who the licensees are, which it characterizes as useless

information serving no public interest. (See Fields Decl. ¶ 10). As the Times correctly notes, however, "[i]f everyone on the list were a widely known public figure with connections to the administration, that would suggest something powerfully important about the licensing process; if no one on the list were known to the general public, that would suggest something else." (Times Reply Mem. at 15). Thus, this is not a case in which the plaintiffs seek "information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." Reporters Comm., 489 U.S. at 773. Rather, because the names on the list are the direct product of agency decisionmaking, there is an inherent public interest in their disclosure. Cf. Lardner, 638 F. Supp. 2d at 28 ("Fundamentally, disclosure of the requested information shines a light on the most basic information about the executive's exercise of his pardon power – who is and who is not granted clemency by the President.").

Of course, the Times does not anticipate that all of the names on the list will be administration insiders whose connections will be self-evident. Rather, it believes that it can evaluate OFAC's decisions for any patterns that might provide insight into – and expose any possible deficiencies in – OFAC's decisionmaking by cross-referencing the names on the list with names of individuals available from other sources. Treasury contends that any useful information obtained as a result of the disclosure of the names therefore would be "derivative" and cannot support a finding of public interest under existing Second Circuit precedent. (See Treasury Mem. at 19-20). The public's interest

14

in derivative information is derived from the requester's "ability to use redacted information to obtain additional as yet undiscovered information outside the government files." Associated Press, 554 F.3d at 290 (discussing derivative use theory but declining to decide whether it "would ever justify the release of personal information" in the Second Circuit). The cases that Treasury cites for the proposition that the information must provide "direct" rather than "derivative" information about the government's performance, however, are not controlling here. Those cases typically address situations in which the requester hopes to use the names and contact information provided by the government so that the persons can be interviewed in an effort to determine whether the government is doing its job. See e.g., Hopkins v. U.S. Dep't of Hous. & Urban Dev., 929 F.2d 81, 88 (2d Cir. 1991) (requester intending to contact individual employees of government contractors to find out if their records were accurate); Hertzberg v. Veneman, 273 F. Supp. 2d 67, 88 (D.D.C. 2003) (requester seeking names of witnesses interviewed in government investigation so that they could be re-interviewed).

   Here, the Times does not base its public interest argument on its proposed use of the names to find other newsworthy information. Rather, the Times intends to use outside information to make sense of the list of names provided by Treasury. This is no more derivative than the use of mapping software to make sense of the addresses of individuals who received emergency benefits from the government. See News-Press v. U.S. Dep't of Homeland Sec., 489 F.3d 1173, 1193-96 (11th Cir. 2007) (requiring disclosure of addresses of aid recipients that plaintiff planned to "superimpose . . . on a

street-level map" to determine whether agency was distributing benefits appropriately). Accordingly, there is a public interest in disclosure of the names of the individual licensees.

Finally, Treasury argues that many of its licensing decisions are made "pursuant to specific licensing policies set forth in OFAC regulations." (Fields Decl. ¶ 10). Although Treasury concedes that other decisions are made on a "case-by-case basis," it contends that often "the identity of the applicant will have little or no bearing on the ultimate licensing decision." (Id.). Even if Treasury is correct on both counts, it, in effect, concedes that certain OFAC decisions are made, at least in part, based on the applicant's identity. The Times is therefore entitled to explore why such decisions are made. Equally so, the Times is entitled to explore whether OFAC truly is making decisions without considering who the applicant is and, if so, whether that makes sense.

Although Treasury disputes the utility of the data that the Times seeks, the privacy interest at issue is minimal. Accordingly, the limited public interest that the Times has identified is sufficient to justify the release of the names.

IV.     Conclusion

For the foregoing reasons, the Times' motion for summary judgment, (ECF No. 9), is granted and Treasury's cross-motion for summary judgment, (ECF No. 17), is denied. By November 2, 2010, Treasury shall provide a copy of the computer-generated spreadsheet for individual licensees, with the relevant columns unredacted. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated:   New York, New York
         October 12, 2010

_____
/FRANK MAAS
United States Magistrate Judge


Copies to:

David E. McCraw, Esq.
The New York Times Company
Fax: (212) 556-1009

Joseph Cordaro
Assistant United States Attorney
Fax: (212) 637-2686